# EXHIBIT B.

## Arizona KOR Trademark Licensing Agreement

**INTELECTUAL PROPERTY LICENSE AGREEMENT**

This Agreement ("Agreement") is made and entered into as of 03/13/2023 (the "Effective Date"), between Universal Brands, Inc. A Nevada Corporation (hereafter "Licensor"), and Kor Cannabis Production Inc. a Nevada Corporation and their Affiliates (Affiliates)" collectively, (hereafter, "Licensee"), is made as follows:

RECITALS

Licensor owns or has license rights to Jack Herer Branded Products including certain copyrights, patents and or trademarks, trade secrets and product Brands, under various trade names, trademarks, designs and logos, namely Original Jack Herer, Original Jack Herer Royal and Original Jack Herer Master  (the "Licensed Properties") identified on Exhibit A.

Licensee desires to acquire rights to exclusively use the Licensed Properties in the state of Arizona and Licensor desires to license to Licensee, the Licensed Properties, under the express terms and conditions of this Agreement.

AGREEMENT

NOW, THEREFORE, for good and valuable consideration, it is mutually agreed as follows:

1)      Licensed Properties Ownership
Licensee acknowledges that Licensor is the sole and exclusive owner and or has master license rights of the Licensed Properties, and in the event that Licensor is a licensee of any of the Licensor Licensed Property, the owner of such Licensor Licensed Property is the sole and exclusive owner (any such owner, including Licensor, a "Licensor IP Owner"), regardless of whether the Licensor Licensed Property is in use with respect to any specific types of goods and services in the Territory or elsewhere as of the Effective Date. Licensee acknowledges and agrees that Licensor may at Licensor's sole discretion amend Exhibit A from time to time to edit, modify, remove, replace and or make available additional marks or to remove those marks that are replaced or become unavailable. Following any removal of a mark by Licensor, Licensee shall be permitted, until the earlier of 60 days following such removal or the depletion of all Licensor Packaging Materials and Labels bearing the removed mark, to sell the Products (the "Sell-Off Period"), provided that all such sales are made subject to all of the provisions of this Agreement.


2)      Title. Licensor represents that it has the authority to grant the license and rights hereby granted, and enter into this Agreement.  All rights and licenses owned and or controlled by Licensor, which are not herein expressly granted to Licensee are reserved to Licensor. Licensee understands and agrees that while it is acquiring the right to use the Licensed Properties it is not acquiring ownership of them, and hereby represents and warrants that it will undertake no act unless in the ordinary course of its business which would in any way damage, encumber them or hold itself out as owning them.

3)      Term.  This Agreement is for a one-year term (the Initial Term). This Agreement shall automatically renew annually for a period of five (5) years (the "Renewal Term"), and continue ongoing unless terminated according to the terms of this Agreement or unless Licensee provides the Licensor with written notice of non-renewal not less than one hundred and twenty (120) days prior to the expiration of the Initial Term. The Renewal Term shall begin upon the expiration of the Initial Term and continue for

the Term or until such time as: (1) Licensee fails to timely make any license, royalty or other payment to Licensor, (2) Licensee violates any term of this Agreement, (3) either party files for bankruptcy or becomes insolvent, (4) Licensee uses the Licensed Property in any way that is wrongful, (5) Licensee is investigated or has an action commenced against it by any governmental or regulatory agency or body, or (6) by operation of law.

4)      <u>License.</u>  Licensor hereby delivers to Licensee the exclusive right to use the Licensed Properties identified on (Exhibit A) for the cultivation and sale of three agricultural products (Products) in the state of Arizona in the operation of its business, to have and to hold such right unto Licensee so that Licensee shall be the exclusive Arizona cultivator and seller of the licensed Products and may not assign any license rights referred to in this Agreement. Licensee may not in any way in the operation of its business or otherwise transfer or encumber the Licensed Properties during the term of this Agreement and Licensee agrees to immediately inform Licensor of any event that could serve to terminate or encumber Licensor's rights in the Licensed Properties. Furthermore Licensor will provide Licensee all Cultivation SOPs (Exhibit B) to follow in order to maintain the Quality Standards (Exhibit C) required of the Licensed Properties

5)      <u>Consideration.</u> Licensor grants this license in exchange for Licensee paying an annual fee of two hundred thousand dollars upon the execution of this agreement and a royalty fee equal to fifteen 15% of the sales price of any and all sales of the Products related to the Licensed Properties licensed to Licensee. Licensee will purchase all packaging that validates the authenticity of the Licensed Properties and or Products as approved, authorized and licensed "Jack Herer" Licensed Properties and or Products from a supplier determined and designated by Licensor. Price for packaging will be determined by Licensor. The parties will agree on a sales price to wholesale and retail for the Products. Licensee may not reduce the agreed upon sales price approved by Licensor (Suggested MSRP), directly or by any means e.g. bundling with other products, buy one get one free and or any other mechanism and shall not sell below Suggested MSRP without Licensor's direct approval. Licensor has the right to purchase the Products from Licensee at Licensee's production cost. Licensee shall provide a monthly sales report including list of customers and locations that are using Products. Licensor shall have the absolute right to audit the complete books and records of Licensee at any time to ensure all payments are accurate and timely made. Neither party hereto shall be under any obligation to pay any other sum whatsoever except as called for in this Agreement.

6)      <u>Payment Terms and Sales Forecast.</u> Licensee will pay the annual fee upon the execution of this agreement. Additionally Licensee will pay the royalty fee of the sales price of any and all sales of the Products related to the Licensed Properties licensed to Licensee within one week of the sale of the Products. Prior to the execution of this Agreement Licensee will provide Licensor a pro-forma sales forecast in sales of units and revenue of the Products. Licensor shall rely on the pro-forma sales forecast to guide and determine packaging inventory supply chain requirements. In the event that Licensee is unable to meet the aforementioned pro-forma sales forecast goals Licensee shall be financially responsible for the continued purchase of the packaging and if requested provide insurance and or a surety bond to ensure performance under this Agreement.

7)      <u>Product Sale Prices.</u> Licensee shall sell the Products to Retailers at the prices specified in Exhibit A (the "Product Sale Prices"), which may be amended from time to time.

8)      Intellectual Property Cooperation. Licensee will report to Licensor any violation of any and all Jack Herer intellectual property. Upon notice of any IP violation, Licensee will notify Licensor of such violation and so that Licensor may pursue additional enforcement of IP. Licensor shall hold in reserves (5% of the Royalty fee) to be allocated for intellectual property violation enforcement efforts. All new licensing agreement opportunities for Jack Herer intellectual properties beyond the license provided to Licensee will be referred to Licensor. Licensee and Licensor agree to cooperate to the fullest extent possible to mutually maintain the Brands value and Products quality. Licensee may not, during or after the Term of this Agreement, engage in any conduct directly or indirectly that would infringe upon, harm or contest any Licensor IP Owner's rights in any of the Licensor Licensed Property or the goodwill associated therewith, including any use of the Licensor Licensed Property in a derogatory, negative, or other inappropriate manner in any media, including but not limited to print or electronic media.

9)      Marketing Promotions and Promotional Items. (Items) Licensor shall hold in reserves (5% of the Royalty fee) for national marketing efforts. Licensee and Licensor agree to cooperate to the fullest extent possible to mutually determine the Items that will support Licensee's sales, maintain and enhance Brand value, highlight the collaboration with Licensee, emphasize and reinforce the authenticity and high quality standard of the Jack Herer Branded Products. The parties' participation may include press release statement, interviews, podcasts, social media posts, content creation, email blast, tradeshows, testimonials and certain Proposed Marketing Promotions and Promotional Items (Exhibit D). Licensor direct campaigns and merchandise are provided at Licensor's cost plus fifteen (15%) percent.

10)     Quality Standards and Infringement. Licensee agrees to abide by the Quality Standards attached hereto as Exhibit C.  Licensee shall promptly notify Licensor in writing of any known or suspected infringement of the Licensor Licensed Property in the Territory.  Subject to the terms hereof, Licensor shall have the exclusive right to take action or institute proceedings with respect to such infringement in the Territory in its sole discretion.  If Licensor elects not to take action to prosecute such action in the Territory, Licensee may, upon Licensor's approval take such action at Licensee's expense.  The parties agree to cooperate with each other with respect to any suits or other action taken under this paragraph and to keep the other party promptly and fully advised with respect thereto.

11)     Termination. Upon termination of this Agreement:

   a) Sell-Off. Licensee may, for a period of ninety (90) calendar days after termination of this Agreement, sell off all remaining Products in inventory subject in accordance with the terms and conditions of this Agreement, including the continuing payment of all License, Royalty and Packaging Fees. Licensee shall not package any additional Products using the Packaging or Licensor Licensed Property during any applicable sell-off period without Licensor's written approval.
   b) Payment of Owed Amounts. Licensee shall immediately pay Licensor for all unpaid License and Royalty fees. Any Royalty payments due to Licensor from the sale of Products during the Sell-Off period shall be made in accordance with the applicable terms of this Agreement, which shall survive the termination hereof until paid in full.
   c) Return of Packaging Materials. At Licensor's request and cost, Licensee shall return all unused Packaging.

12)     Reversion of Rights. Upon termination of The Licensor LICENSE, regardless of the manner or means of termination, Licensee shall cease all usage of, publication of, or reference to the Licensed

Properties in any form. All of Licensee's rights to use the Licensor Licensed Property shall revert to Licensor without further act or deed of any Party, and Licensee will not, cultivate, distribute, market, or sell, any Products

13) <u>Business Names and Domain Names</u>. Without Licensor's prior written consent, Licensee shall not use the Licensor's Licensed Property (or any mark confusingly similar thereto), individually or in combination, as part of its corporate or trade name or any domain name.

14) <u>Licensee Representations, Warranties And Covenants</u>. Licensee hereby represents, warranties and covenants that:

   a) Licensee is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Colorado;
   b) Licensee has the right, power and authority to make and enter into and fully perform its duties and obligations under this Agreement;
   c) Licensee's execution, delivery and performance of this Agreement does not violate any provision of any agreement to which Licensee is a party or beneficiary, or any agreement to which any person or entity affiliated with Licensee is a party;
   d) Licensee will strictly comply at all times with Applicable Law in connection with the cultivation, packaging, distribution, and/or sale of the Products pursuant to the terms and conditions of this Agreement, including, without limitation, to (A) make all required disclosures; (B) ensure that all others authorized by Licensee or acting on Licensee's behalf in connection with this Agreement, including, without limitation, the Subcontractors, strictly comply at all times will Applicable Laws in connection with the cultivation and distribution and/or sale of the Products in the Territory; and (C) regularly monitor and audit such strict compliance;
   e) Licensee will not package, distribute or sell the Products, or use the Licensor Licensed Property outside of the Territory;
   f) During cultivation, Licensee will keep the agricultural Products separate and distinct from the other varieties it grows, such that the agricultural Products are not cross-bred or genetically intermingled with other plant material or Strains (for the avoidance of doubt, this standard does not necessarily require physical barriers if cross-breeding is otherwise avoided) without Licensor's prior written consent;
   g) Licensee will maintain all licenses that may be required by Applicable Law for purposes of conducting its business and performing its obligations hereunder;
   h) Licensee will pay any and all applicable taxes required by Applicable Law on Products cultivated, distributed and sold by Licensee, or ensure they are collected from any appropriate third party.
   i) Licensee will fulfill all obligations to enter transactions and other data into the state's cannabis track-and-trace system and shall provide all necessary information for Licensor to do the same, as required by law;
   j) Licensee will notify Licensor within twenty-four (24) hours upon discovery or suspicion of diversion, theft, loss, breach of security, or any other criminal activity relating to the Products, or the Packaging;
   k) Licensee ensure that the Products comply with the Quality Standards and Applicable Law at all times;
   l) Licensee and each of the Subcontractors owns all licenses and permits that are necessary to fulfill Licensee's obligations and activities under this Agreement in accordance with Applicable Law, including, without limitation, the licenses and permits required by law (the "Licensee Business

Permits"). Licensee shall provide to Licensor with current and up-to-date copies of any changes in the Licensee Business Permits from time to time;

i) Licensee will remain liable for the Subcontractors' performance or failures and will ensure that such Subcontractors abide by this Agreement. Licensee will ensure that each of the Subcontractors has valid, current and appropriate licenses under Applicable Law to perform any subcontracted duties.

15) <u>Regulatory Disclosures.</u> Licensee hereby agrees to comply with the Applicable Laws of Arizona. This shall include, without limitation, any disclosures required by applicable regulatory authorities in connection with Licensee's State of Arizona cannabis licenses or local business permits.

16) <u>Insurance.</u> During the Term of this Agreement and for a period of three (3) years thereafter, Licensee shall maintain, at its sole cost and expense, in full force and effect a comprehensive general business liability insurance policy, consistent with commercial practices or standards for similar industries, insuring against any and all loss, liability, or business interruption arising from the obligations and activities of Licensee hereunder including, without limitation, those arising from product liability, personal injury, wrongful death, or property damage and contractual liability with respect to the indemnity obligations set forth in this Agreement, with co-Licensee limits of not less than One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) in the aggregate. The insurance company providing such insurance must have an A.M. Best rating of A- or better. The policy shall contain a waiver of subrogation with respect to Licensor and the policy shall contain all appropriate riders and endorsements. Licensee shall name Licensor as an "additional insured" on all required insurance policies and shall provide Licensor with copies of certificates of insurance so reflecting.

17) <u>Accounts, Reporting and Consumer Complaints.</u> Licensee shall keep account books and records showing the cultivation, packaging, sale or other distribution of Products (the "Reports"). Such books and records shall be maintained for a period of at least three (3) years after the payment of the corresponding Packaging Fee. Books and records shall be available for inspection by Licensor or a duly authorized representative of Licensor during normal business hours and on reasonable advanced notice. Licensee will cooperate with Licensor in any such audit request. If any audit determines that the Packaging Fee paid was less than the amount that should have been paid, all payments required to be made to eliminate the discrepancy shall be made promptly upon Licensor's demand. Should such an audit reveal an error in Licensee's favor of more than five percent (5%) in the calculation of payments due to Licensor, Licensee will promptly reimburse Licensor for its audit expenses.

a) Licensee shall promptly inform Licensor, in writing, of any and all consumer complaints or claims (each, a "Complaint") regarding any Product that comes to its attention. Such Complaint reports shall contain the date the consumer complaint was received, the name and address of the reporting person, and a detailed description of the circumstances. Complaints shall be reported within ten (10) Business Days of receipt, except for "serious" Complaints, which shall be reported not later than twenty-four (24) hours following receipt. A "serious" Complaint shall mean one alleging an adverse reaction or product defect that causes fatal, life-threatening, disabling, incapacitating injury to the consumer, or which results in prolonged hospitalization, and shall also include any media inquiry or government inquiry with respect thereto.

b) For the avoidance of doubt, the Reports kept by Licensee shall be required only for Products sold pursuant to the Licensor License granted herein and shall not be required, nor shall any such books or records be accessible to Licensor, for any business of products outside the Products labeled with the Packaging pursuant to this Agreement.

18)     <u>Waiver</u>. The waiver by any party of the performance by another party of any provision of this Agreement shall not invalidate this Agreement, nor shall it be considered a waiver of any other provision of this Agreement, nor shall it be considered a waiver of the performance of such provision required to be made at a later date.  The waiver or extension by any party of the time for performing any action shall not constitute a waiver or extension of time for performing any other act or the identical act required to be performed at a later time, except that the performance of any dependent/reciprocal action of the waiving party shall be extended by a period of time equal to the period of the delay. The waiver by any party of any breach by another party of any provision of this Agreement shall not constitute a waiver of the breach of any other provision of this Agreement, or of any preceding or succeeding breach of the same provision. Any waiver under this Agreement must be in writing and signed by the waiving party to be effective, and shall be effective only to the extent of such writing.

19)     <u>Indemnity</u>. Licensee shall indemnify, defend and hold harmless Licensor and its officers, directors, shareholders, employees, contractors, agents and Affiliates (each, a "Indemnified Licensor Party"), from and against any and all demands, claims, complaints, actions or causes of action, suits, proceedings, investigations, arbitrations, assessments, losses, damages, liabilities, costs, and expenses, including, but not limited to, interest, penalties and attorneys' fees and disbursements, asserted against, imposed upon or incurred by any Indemnified Licensor Party, directly or indirectly, known or unknown, by reason of, which relate to, arise out of or are in any way connected with (directly or indirectly): (1) any liability or obligation of or claim asserted against a Indemnified Licensor Party (whether absolute, accrued, contingent or otherwise and whether contractual, tax, criminal or any other type of liability or obligation or claim) which relate to, arise out of or are in any way connected with (directly or indirectly) this Agreement or the manufacture, process, purchase, importation, sale, shipment, transportation, distribution or taxing of the Products or the provision of any Services hereunder; (2) any breach of this Agreement by Licensee or any Affiliate of Licensee; or (3) any noncompliance by Licensee, or any Affiliate of Licensee, with any covenants, agreements or undertakings of Licensee, or any Affiliate of Licensee, contained in this Agreement or in any contracts with customers or suppliers involving the manufacture, processing, importation, sale, shipment, transportation, distribution or taxing of the Products; or (4) any dispute or disagreement between or among any current or former member(s), manager(s), director(s), officer(s), employee(s), owners or operators of Licensee or any Affiliate's of Licensee. Licensee's obligations under this Paragraph shall survive indefinitely after the expiration or earlier termination of this Agreement.

20)     <u>Affiliates</u>. "Affiliate" means any Person (as defined below) directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with another Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through membership, ownership of voting securities, by contract, or otherwise. "Person" means any individual, corporation, partnership, joint venture, limited liability company, trust, governmental body or authority, Indian tribe or other organization. This Agreement is entered into by Licensee on behalf of itself and all of its Affiliates.  Each of Licensee's Affiliates shall be jointly and severally liable for all of Licensee's obligations under this Agreement.

21)     <u>No Partnership</u>. This Agreement shall not be construed as creating a partnership or joint venture between the parties, and the parties shall be considered independent contractors in all respects.  Neither party may assume or create any obligation or responsibility, express or implied, on behalf of the other or bind the other in any manner whatsoever except as expressly provided herein or as necessary for Licensor to fulfill the terms of this Agreement.

22) <u>Binding effect, Assignment</u>. This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, executors, administrators, successors, and permitted assigns. This Agreement shall not be assigned by Licensee, in whole or in part, without the prior written consent of Licensor. This Agreement may be assigned by Licensor in its sole and absolute discretion.

23) <u>Third Parties</u>.  Nothing in this Agreement shall confer upon any Person not a party to this Agreement any rights or remedies of any nature or kind whatsoever under or by reason of this Agreement.

24) <u>Notices</u>.  All notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid), or (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment confirmed with a copy delivered as provided in clause (a), in each case to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a party may designate by notice to the other parties):

| If to Licensor: | If to Licensee: |
|---|---|
| Dennis D'Allesio | Joseph, CEO |
| Universal Brands, Inc. | Kor Cannabis Production Inc. |
| *Dennis D'Allesio* (DocuSigned: E9B0C4171CE542A...) | *[signature]* (DocuSigned: 4092D8B8C5F84BE...) |
| Dennis D'Allesio | Joseph Strauss |
| Dennis@sbn.com | jstrauss@korcannabis.com |

Any such notice shall, if delivered personally, be deemed received upon delivery; shall, if delivered by certified mail, be deemed received upon the earlier of actual receipt thereof or five (5) business days after the date of deposit in the United States mail, as the case may be; and shall, if delivered by nationally recognized overnight delivery service, be deemed received the first business day after the date of deposit with the delivery service.

25) <u>Compliance</u>.  Licensee agrees to fully comply with all applicable laws, including but not limited to: all laws and regulations administered by federal, state, tribal and local authorities.

26) <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an <u>original</u>, and all of which together shall be considered one and the same agreement. A photocopy, facsimile, electronic or other copy of this Agreement shall have the same effect for all purposes as an ink-signed original.

27) <u>Territory</u>. The "Territory" covered by this Agreement means: The State of Arizona.

28) <u>Attorneys' Fees</u>.  If any arbitration, action, suit, mediation or other proceeding is instituted by any party hereto under or in connection with this Agreement, the prevailing party in such arbitration, action, suit, mediation or proceeding (including all appeals and petitions therefrom) shall be entitled to an award of the prevailing party's costs of collection, costs of suit, expenses and attorneys' fees and other

professional fees (including the expenses and fees of experts) as may be fixed by the arbitrator (s), court or other tribunal.

29) <u>Cumulative Remedies</u>. Except as otherwise expressly provided herein, all remedies hereunder shall be cumulative and nonexclusive.

30) <u>Specific Performance</u>. Licensee acknowledges that Licensor is forgoing other business opportunities, has invested significant time, effort and expense and is relying on Licensee's performance of its obligations under this Agreement, including Licensee's Obligations, and that Licensee's failure to fully and faithfully perform its obligations under this Agreement, including Licensee's Obligations, will irreparably harm Licensor's reputation, business relationships and financial viability. Licensee acknowledges that money damages would be both incalculable and an insufficient remedy for any breach of this Agreement by Licensee and that any such breach would cause Licensor irreparable harm. Accordingly, Licensee agrees that, in the event of any breach or threatened breach of the provisions of this Agreement by Licensee, Licensor shall be entitled to seek equitable relief without the requirement of posting a bond or other security, including in the form of injunctions and orders for specific performance, in addition to all other remedies available to Licensor at law or in equity.

31) <u>Forum; Service of Process</u>. Any legal suit, action or proceeding brought by Licensee or Licensor arising out of or based upon this Agreement or the Exhibits hereto shall be instituted in the courts of the State of California, County of Los Angeles, or in the Federal Courts of the Central District of California as determined by the Licensor (collectively, the "Courts"), and each of Licensee, Licensor and their Affiliates waives any objection which it may now or hereafter have to the laying of venue of any such proceeding, and irrevocably submits to the exclusive jurisdiction of the Courts in any such suit, action or proceeding.

32) <u>Non-Circumvention</u>. By entering into this agreement, Recipient agrees that without prior written consent of Licensor, at no time shall Recipient or any of its representatives, contractors, agents or affiliates circumvent or attempt to circumvent Licensor in any way, at any time or in any manner whatsoever, including upon termination of the relationship with Licensor. Recipient further agrees not contact, solicit, engage or to do business with, in any manner, directly or indirectly any current or former employee, vendor, customer, business associate, affiliate business prospect, partners, businesses, individuals or their employees, involved with Licensor for any reason whatsoever without prior written consent of Licensor. Parties hereto agree that the appearance that Recipient has circumvented (or has threatened to circumvent) Licensor in violation of this agreement or the appearance that Recipient has used or disclosed (or has threatened to use or disclose) Confidential Information in violation of this Agreement, will subject Recipient to liquidated damages in the amount of five million dollars or three times the proceeds Licensor otherwise would have earned under the terms of any contracts, agreements or potential business opportunities affected by the circumvention, whichever is greater. *Unauthorized Use or Disclosure of Information*. If it appears that Recipient has circumvented (or has threatened to circumvent) Licensor in violation of this agreement or if it appears that Recipient has used or disclosed (or has threatened to use or disclose) Confidential Information in violation of this Agreement, Licensor shall be entitled to an injunction to restrain Recipient from circumventing and or making use of and or disclosing, in whole or in part, the Confidential Information. Licensor shall not be prohibited by this provision from pursuing other remedies, including a claim for losses and damages.

33) <u>Confidentiality</u>. Licensee agrees that it shall take all reasonable precautions and use all best efforts to protect the secrecy and confidentiality of any Confidential Information and to ensure that any

Confidential Information is kept confidential. "Confidential Material" refers to written, oral or observed material or information disclosed to Licensee or its Affiliates by Licensor or its advisors that contains information about Licensor or any of its current or anticipated future services or business methods and practices.  The term "Confidential Material" includes information about Licensor's business, including the manner in which Licensor does business, provides its services, future business prospects or contemplated transactions, marketing/sales/distribution processes, strategies or relationship, innovations, trade secrets, know-how, technical and systems designs and specifications, and also customer lists, information and agreements, financial information, ownership information, pricing, sourcing and other marketing, sales and distribution information, analyses, strategies, relationships, notes, compilations, studies and other documents prepared by or for Licensee or its Affiliates or advisors on the basis of material that is otherwise Confidential Material.  All Confidential Material, including without limitation inventions, trade secrets, customer information, innovations, marketing/sales/distribution processes, strategies, relationships and know-how, developed, conceived or reduced to practice prior to or during the Term of this Agreement shall be the sole and exclusive property of Licensor. Licensee (and its Affiliates) hereby assigns all of its/their rights, title and interest in the same to Licensor. Licensor shall provide to Licensee such Confidential Material as Licensor determines to be required for the purposes of this Agreement. By accepting such Confidential Material, Licensee and its Affiliates agrees that it/they will use the Confidential Material only for the purposes of this Agreement and never to the detriment of Licensor and will keep all of Licensor's Confidential Material confidential forever in perpetuity; provided, however, that Confidential Material and the contents thereof may be disclosed (i) to the minimum extent necessary to comply with any order or directive from any governmental agency with authority to regulate the Products, and (ii) to directors, officers, employees, advisors and representatives of Licensee who need to know such information for the purposes of this Agreement. Licensee and its Affiliates shall take all reasonable precautions to ensure that it and none of its or its Affiliates' directors, officers, managers, members, employees, advisors and representatives makes any disclosure of Confidential Material other than as contemplated herein.  Such precautions shall include without limitation making, its Affiliates and their respective directors, officers, managers, members, employees, advisors and representatives aware of the confidentiality covenants of this Agreement in advance of such disclosure and securing their agreement to comply with the confidentiality covenants of this Agreement. During the Term and in perpetuity thereafter, except as may be required by applicable law, Licensee and its Affiliates will not, without the prior written consent of Licensor, disclose any Confidential Material to any Person. If Licensee or an Affiliate is, in the opinion of its legal counsel, required by applicable law to disclose any Confidential Material to any Person, Licensee and the Affiliate may disclose such Confidential Material only to the extent so required, provided that Licensee and the Affiliate shall (i) exercise reasonable efforts, where such applicable law so permits, to obtain reasonable assurance that such Confidential Material shall be accorded confidential treatment by the Person to whom it is disclosed and (ii) provide Licensor,  where reasonably practicable, with notice of such disclosure reasonably in advance thereof so that Licensor may seek a protective order or other appropriate remedy or waive compliance with this Agreement. Upon the expiration of the Term or earlier termination of this Agreement, or upon written notice from Licensor at any time, Licensee and its Affiliates will promptly destroy the Confidential Material or deliver such Confidential Material to Licensor, without retaining any copy or portion thereof. Licensee and its Affiliates agree that money damages would not be a sufficient remedy for any breach of this Agreement by it/them and that Licensor shall be entitled to injunctive relief and an *ex parte* temporary restraining order for any such breach or threatened breach, all without the requirement of having to post a bond.  Such remedy shall not be deemed to be the exclusive remedy for any breach by Licensee or its Affiliates of this Agreement but shall be in addition to all other remedies available at law or in equity to Licensor. Licensor agrees that it shall take all reasonable precautions and use all best efforts to protect the secrecy and confidentiality of any "Licensee Confidential Information" hereafter (Licensee Confidential Information)

which means (any financial or employee information of the Licensee, limited to: personnel data, financial data which are marked "Confidential Information" and to ensure that any Licensee Confidential Information is kept confidential.

34) <u>Governing Law.</u>  This Agreement is subject to and shall be interpreted and enforced under the laws of the State of Nevada and the United States, without regard to choice of law principles.  If any legal action is commenced which arises out of or is to enforce this Agreement, jurisdiction and venue shall be in Clark County, State of Nevada.  The prevailing party shall be entitled to costs, including attorney's fees.

35) <u>Mutuality.</u>  Each of the parties has carefully read and considered the terms and provisions of this Agreement and had the opportunity to review it with counsel of its choosing.  Each of the parties agrees that the terms and provisions are fair, reasonable and required for the protection of the interests of the parties and their agents, affiliates, officers, directors, employees, successors and assigns.  This Agreement shall be treated as if drafted by the parties jointly.

36) <u>Amendment</u>. This Agreement shall not be amended, modified, or supplemented by Licensee, in whole or in part, without the prior written consent of Licensor. This Agreement may be amended, modified, or supplemented by Licensor in its sole and absolute discretion.

37) <u>Assumption Of Agreement.</u>  This Agreement will inure to the benefit of, and is binding upon the representatives, agents, employees, heirs, successors and assigns of the parties.

38) <u>Severability.</u> In the event that any provision of this Agreement is found to be void or invalid, the remaining provisions shall be binding on the parties as though the void or invalid portion were deleted, provided that the purpose of this Agreement can be carried forward in the absence of such provision.

39) <u>Entire Agreement</u>. This Agreement, together with the Exhibits hereto, represents the entire agreement and understanding of the parties with respect to the subject matter of this Agreement and there are no agreements, undertakings, restrictions, representations, or warranties among the parties other than those set forth in this Agreement or in the Exhibits attached hereto.  This Agreement supersedes all prior negotiations, discussions, correspondence, communications, understandings, and agreements between the parties relating to the subject matter of this Agreement. This Agreement is not final until executed by all parties hereto.

By: _/s/ Dennis D'Allesio_ (DocuSigned, E9B0C4171CE542A...)
Licensor: Universal Brands, Inc.
Dennis D'Allesio

By: _/s/_ (DocuSigned, 4092D8B8C5F84BE...)
Licensee: Kor Cannabis Production Inc.
Joseph Strauss

Dated: 3/24/2023

Dated: 3/24/2023

## Exhibit A

## LICENSED PROPERTIES/PRODUCT SALE PRICES

| IP Description |
| :---: |
| **Original Jack Herer Reserve** |
| **Original Jack Herer Royal Reserve** |
| **Original Jack Herer Master Reserve** |

**Product Sale Prices:**

| No. | Product Name | Product Sale Price |
| :---: | --- | --- |
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |
| 6. | | |

## **Exhibit B**

## **CULTIVATION/GENETICS SOPS**

## Exhibit C

## QUALITY STANDARDS

1) <u>Trademark Notices</u> Properly designate the status of the Licensor Licensed Property trademarks by using the correct trademark symbol (® or ™) reflecting Licensor Inc.'s ownership of particular marks as set forth below. Also include an attribution of Licensor Inc.'s ownership in the following format: "_____ is a Trademark of Herer Brands Inc."

2) <u>References to Licensor.</u>

   a) In letters, memos, press releases, white papers, advertising, slides, foils, video, and other multimedia presentations:

   b) Properly designate (with ® or ™) all Licensor Licensed Property trademarks at the most prominent use (usually a headline) and again on the first occurrence in copy; and

   c) In the case of presentation graphics, trademarks should be designated with the proper trademark symbol on each page, slide, and foil.

   d) In newsletters, magazines, and publications containing multiple articles:

   e) Properly designate (with ® or ™) all Licensor Licensed Property trademarks on the first occurrence in the document, in headlines and on the first occurrence in every article in which they are used.

   f) In brochures, annual/quarterly reports, books, technical documentation, and other bound documents:

   g) Properly designate (with ® or ™) the Licensor Licensed Property trademarks on the first occurrence in the document, in headlines, and on the first occurrence in text.

   h) In all charts or graphs, properly designate the Licensor Licensed Property trademarks (with ® or ™).

   i) On all packaging, always use the trademark symbol in every reference.

   j) Trademarks are Singular Adjectives, Not Verbs and Should Not be Made Possessive

   k) Use Licensor Licensed Property trademarks only as adjectives followed by the appropriate generic product or service noun describing the relevant product or service (e.g., "the ASENA® information Goods"). Licensor Licensed Property trademarks should not be used in plural or possessive form or as verbs.

3) <u>Ownership Assertion.</u> Do not assert rights over any Licensor Licensed Property whether by incorporating Licensor Licensed Property into your own product or service names, trademarks, logos,

DocuSign Envelope ID: 10E705BC-5534-4C70-9982-FE7AF52D191A

company names, or domain names or seeking a Patent, Trademark or domain name registration related to any Licensor Licensed Properties.

4) <u>Style of Use.</u> When using Licensor Licensed Property trademarks: (i) follow the style and usage guidelines available in our Brand Style Guide; (ii) use our Licensor Licensed Property design marks exactly as they appear here, and do not alter or distort their appearance in any way, for example, by adding your own design elements or changing the font, colors, or size; (iii) allow for clear space around our Licensor Licensed Property design marks; and (iv) maintain the legibility of our Licensor Licensed Property design marks and keep them sharp, clear, and well-produced. When using our Licensor Licensed Property world trademarks, you may not change their appearance by abbreviating them, incorporating them into acronyms, changing their spelling, using them in parts, or using improper capitalization.

5) <u>No Trademark Bidding.</u> Unless expressly permitted in an agreement between you and Licensor Inc., you may not bid on Licensor Licensed Property trademarks (or any variant or extension thereof) as a keyword on any search engine, or use Licensor Licensed Property trademarks (or any variant or extension thereof) in any form of paid advertising including, but not limited to, paid social and display advertisements.

6) <u>No Tarnishment.</u> You may not use Licensor Licensed Property trademarks in any disparaging or degrading manner.

**Exhibit E**
**Proposed**
**Sales, Marketing, & Promotions Support Program Initiatives**

1. Website mgmt., including e-commerce, social media, ad clicks, SEO
2. Influencer campaign, management
3. Advertising creative & (digital, print, billboard)
4. Digital media, on-air TV / Radio content creation/ Cannabis talk radio
5. Ad buys
6. Event calendar & coordinated brand launch promotion
7. Brand Ambassadors & promotional canvassing
8. Influencer campaign, management
9. Celebrity endorsements / brand advocate / brand Ambassador
10. PR/GR campaigns
11. Strategic alliances / sponsorships
12. Charitable Community Outreach
13. Vertical Integration for better margins and price flexibility
14. National scope & volume sales create economies of scale
15. Marketing blitz across platforms = speed to market awareness for faster growth
16. Influencer campaign and celebrity endorsements for perceived value and insulation from downward pricing pressure
17. Sustainable packaging and compassionate care campaign creates universal, transcendent value for today's socially-conscious customers
18. BOGO/Bundling Electronic Coupon Program = effectively a 50% savings to consumers, speeding product adoption & retail "pull-thru" as well as new product insertion
19. Bus Promotions for consumption education at retail and festival events
20. Print on demand Branded Apparel
21. Organic social media campaigns
22. Data-driven paid social media campaigns
23. Data tracking