**KAREN L. BASHOR, ESQ.**
Nevada Bar No. 11913
**JONATHAN A. RICH, ESQ.**
Nevada Bar No. 15312
**WILSON, ELSER, MOSKOWITZ,**
**EDELMAN & DICKER LLP**
6689 Las Vegas Boulevard, South, Suite 200
Las Vegas, NV  89119
T (702) 727-1400; F (702) 727-1401
karen.bashor@wilsonelser.com
jonathan.rich@wilsonelser.com
*Attorneys for Defendant Daniel Herer*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| HERER BRANDS INC., a Nevada corporation, | CASE NO:    2:23-cv-01235-JCM-BNW |
| Plaintiff, | |
| vs. | **DEFENDANT DANIEL HERER'S ANSWER TO PLAINTIFF'S COMPLAINT; COUNTERCLAIM AGAINST PLAINTIFF HERER BRANDS, INC.; THIRD-PARTY COMPLAINT AGAINST DENNIS D'ALESSIO, OLIVER DUGGAL, CALYFX, UNIVERSAL BRANDS, INC., AND D'ALESSIO INVESTMENTS, LLC; DEMAND FOR JURY TRIAL** |
| DANIEL HERER, an individual, and DOES 1 through 10, inclusive; ROE BUSINESS ENTITIES, 1 through 10, inclusive, | |
| Defendants. | |
| DANIEL HERER, an Individual | |
| Counter-Claimant, | |
| vs | |
| HERER BRANDS, INC., a Nevada Corporation | |
| Counter-Defendant | |

285923833v.1

DANIEL HERER, an Individual

                Third-Party Plaintiff,

vs

DENNIS D'ALESSIO, an Individual; OLIVER DUGGAL, an Individual; CALYFX, a California corporation; UNIVERSAL BRANDS, INC., a Nevada corporation.

                Third-Party Defendants.

Defendant, Daniel Herer, by and through his attorneys of record, Karen L. Bashor, Esq. and Jonathan A. Rich, Esq. of the law firm of WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP, hereby answers Plaintiff, Herer Brands Inc.'s ("Plaintiff") Complaint on file herein and hereby admits, denies, and asserts as follows.

Defendant denies the allegations and characterizations in the Complaint unless expressly admitted in the following numbered paragraphs, which correspond to the numbered paragraphs in the Complaint.

## **INTRODUCTION**

1.    Answering Paragraph 1 of the complaint, Defendant admits that he is the son of Jack Herer. As to the remaining allegations in the paragraph, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

2.    Answering Paragraph 2 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of those allegations. On that basis, Defendant denies those remaining allegations.

3.    Answering Paragraph 3 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of those allegations. On that basis, Defendant denies those remaining allegations.

4.     Answering Paragraph 4 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of those allegations. On that basis, Defendant denies those remaining allegations.

5.     Answering Paragraph 5 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of those allegations. On that basis, Defendant denies those remaining allegations.

6.     Answering Paragraph 6 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of those allegations. On that basis, Defendant denies those remaining allegations.

7.     Answering Paragraph 7 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of those allegations. On that basis, Defendant denies those remaining allegations.

## **PARTIES**

8.     Answering Paragraph 8 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

9.     Answering Paragraph 9 of the complaint, Defendant admits that he is a resident of Los Angeles County, California.

10.     Answering Paragraph 10 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

11.     Answering Paragraph 11 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

/ / /

/ / /

/ / /

285923833v.1

**JURISDICTION AND VENUE**

12.     Answering Paragraph 12 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

13.     Answering Paragraph 13 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

14.     Answering Paragraph 14 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

15.     Answering Paragraph 15 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

**GENERAL ALLEGATIONS**

16.     Answering Paragraph 16 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

17.     Answering Paragraph 17 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

18.     Answering Paragraph 18 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

19.     Answering Paragraph 19 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

285923833v.1

20.     Answering Paragraph 20 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

21.     Answering Paragraph 21 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

22.     Answering Paragraph 22 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

23.     Answering Paragraph 23 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

24.     Answering Paragraph 24 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

25.     Answering Paragraph 25 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

26.     Answering Paragraph 26 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

27.     Answering Paragraph 27 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

28.     Answering Paragraph 28 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

285923833v.1

29.     Answering Paragraph 29 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

30.     Answering Paragraph 30 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

31.     Answering Paragraph 31 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

32.     Answering Paragraph 32 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

33.     Answering Paragraph 33 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

34.     Answering Paragraph 34 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

35.     Answering Paragraph 35 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

36.     Answering Paragraph 36 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

37.     Answering Paragraph 37 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

285923833v.1

38.     Answering Paragraph 38 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

39.     Answering Paragraph 39 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

## FIRST CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTIES

40.     Answering Paragraph 40 of the complaint, Defendant incorporates by reference his responses to paragraphs 1-39 of the Complaint as if set forth fully in here. Paragraph 40 does not contain any allegations for Defendants to admit or deny.

41.     Answering Paragraph 41 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

42.     Answering Paragraph 42 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

43.     The allegations in Paragraph 43 of the complaint contain legal conclusions to which no response is required. To the extent that a response is required, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

44.     The allegations in Paragraph 44 of the complaint contain legal conclusions to which no response is required. To the extent that a response is required, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

/ / /

/ / /

285923833v.1

**SECOND CAUSE OF ACTION**

**TORTIOUS INTERFERENCE WITH CONTRACTUAL OBLIGATIONS**

45.     Answering Paragraph 45 of the complaint, Defendant incorporates by reference his responses to paragraphs 1-44 of the Complaint as if set forth fully in here. Paragraph 45 does not contain any allegations for Defendants to admit or deny.

46.     Answering Paragraph 46 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

47.     Answering Paragraph 47 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

48.     Answering Paragraph 48 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

49.     Answering Paragraph 49 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

50.     The allegations in Paragraph 50 of the complaint contain legal conclusions to which no response is required. To the extent that a response is required, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

51.     The allegations in Paragraph 51 of the complaint contain legal conclusions to which no response is required. To the extent that a response is required, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

/ / /

/ / /

285923833v.1

1

2

**THIRD CAUSE OF ACTION**

**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

3

4

5

52.     Answering Paragraph 52 of the complaint, Defendant incorporates by reference his responses to paragraphs 1-51 of the Complaint as if set forth fully in here. Paragraph 52 does not contain any allegations for Defendants to admit or deny.

6

7

8

53.     Answering Paragraph 53 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

9

10

11

54.     Answering Paragraph 54 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

12

13

14

55.     Answering Paragraph 55 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

15

16

17

56.     Answering Paragraph 56 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

18

19

20

57.     Answering Paragraph 57 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

21

22

23

24

58.     The allegations in Paragraph 58 of the complaint contain legal conclusions to which no response is required. To the extent that a response is required, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

25

26

59.     The allegations in Paragraph 59 of the complaint contain legal conclusions to which no response is required. To the extent that a response is required, Defendant lacks knowledge or

27

28

285923833v.1

information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

## FOURTH CAUSE OF ACTION

### BREACH OF CONTRACT

60.     Answering Paragraph 60 of the complaint, Defendant incorporates by reference his responses to paragraphs 1-59 of the Complaint as if set forth fully in here. Paragraph 60 does not contain any allegations for Defendants to admit or deny.

61.     Answering Paragraph 61 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

62.     Answering Paragraph 62 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

63.     Answering Paragraph 63 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

64.     The allegations in Paragraph 64 of the complaint contain legal conclusions to which no response is required. To the extent that a response is required, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

## FIFTH CAUSE OF ACTION

### BUSINESS DISPARAGEMENT

65.     Answering Paragraph 65 of the complaint, Defendant incorporates by reference his responses to paragraphs 1-64 of the Complaint as if set forth fully in here. Paragraph 65 does not contain any allegations for Defendants to admit or deny.

66.     Answering Paragraph 66 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

67.     Answering Paragraph 67 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

68.     Answering Paragraph 68 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

69.     The allegations in Paragraph 69 of the complaint contain legal conclusions to which no response is required. To the extent that a response is required, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

70.     The allegations in Paragraph 70 of the complaint contain legal conclusions to which no response is required. To the extent that a response is required, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

## SIXTH CAUSE OF ACTION

### CONVERSION

71.     Answering Paragraph 71 of the complaint, Defendant incorporates by reference his responses to paragraphs 1-70 of the Complaint as if set forth fully in here. Paragraph 71 does not contain any allegations for Defendants to admit or deny.

72.     Answering Paragraph 72 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

/ / /

285923833v.1

73.     Answering Paragraph 73 of the complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

74.     The allegations in Paragraph 74 of the complaint contain legal conclusions to which no response is required. To the extent that a response is required, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

75.     The allegations in Paragraph 75 of the complaint contain legal conclusions to which no response is required. To the extent that a response is required, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

**SEVENTH CAUSE OF ACTION**

**PRELIMINARY AND PERMANENT INJUNCTION**

76.     Answering Paragraph 76 of the complaint, Defendant incorporates by reference his responses to paragraphs 1-75 of the Complaint as if set forth fully in here. Paragraph 76 does not contain any allegations for Defendants to admit or deny.

77.     The allegations in Paragraph 77 of the complaint contain legal conclusions to which no response is required. To the extent that a response is required, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

78.     The allegations in Paragraph 78 of the complaint contain a prayer for relief that should be reserved for the section of the complaint entitled "PRAYER FOR RELIEF". To the extent that a response is required, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. On that basis, Defendant denies those allegations.

/ / /

/ / /

/ / /

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The allegations contained in Plaintiff's Complaint fail to state a cause of action against any of the defendants upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the applicable statutes of repose.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff, by way of acts and omissions, has waived any entitlement to any recovery on the claims asserted.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's damages, if any, were proximately caused and contributed to, in whole or in part, by Plaintiff's own conduct, thereby completely or partially barring Plaintiff from recovering herein; and any judgment in favor of Plaintiff against any of the defendants should be reduced in proportion to Plaintiff's own comparative negligence.

### SIXTH AFFIRMATIVE DEFENSE

Defendant is not legally responsible for the acts and/or omissions of those who are named as fictitious Defendants.

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's damages if any, were proximately caused and contributed to, in whole or in part, by the acts or omissions of parties not named as a defendant in Plaintiff's Complaint; wherefore any recovery obtained by Plaintiff from Defendant should be reduced by an amount equal to the percentage of the fault of those unnamed persons.

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiff failed to take reasonable steps to minimize or prevent the damages alleged in the Complaint.

285923833v.1

**NINTH AFFIRMATIVE DEFENSE**

Defendant has employed the services of an attorney to defend this action and a reasonable sum should be allowed for its attorney's fees and costs incurred in defending this action.

**TENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, because of the failure to name an indispensable party or parties.

**ELEVENTH AFFIRMATIVE DEFENSE**

Pursuant to Fed. R. Civ. P. 11, as amended, all possible affirmative defenses may not have been alleged herein insofar as sufficient facts were not available after reasonable inquiry upon the filing of Defendant' answer and therefore, Defendant has the right to amend.

**PRAYER FOR RELIEF**

WHEREFORE, Defendant respectfully request that this Court:

1.      Dismiss all of the claims against Defendant with prejudice;

2.      Deny all of the relief requested by Plaintiff;

3.      Award Defendant the costs it incurred in the defense against the Complaint, including attorneys' fees and costs; and

4.      Grant Defendant any other relief that this Court deems just and proper.


**COUNTERCLAIM/THIRD-PARTY COMPLAINT AGAINST HERER BRANDS, INC., DENNIS D'ALESSIO, OLIVER DUGGAL & D'ALESSIO CONTROLLED ENTITES**

Defendant, Daniel Herer, by and through his attorneys of record, Karen L. Bashor, Esq. and Jonathan A. Rich, Esq. of the law firm of WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP, hereby counterclaims against Plaintiff / Counter-Defendant Herer Brands, Inc., a Nevada corporation; and asserts a third-party complaint against Daniel D'Alessio; Oliver Duggal; CalyFx; and Universal Brands, Inc., as follows.

/ / /

/ / /

285923833v.1

**PARTIES**

1.      At all times relevant herein, Daniel Herer is and was a resident of Los Angeles County, California.

2.      At all times relevant herein, Counter-Defendant Herer Brands Inc., ("Herer Brands"), is and was a Nevada corporation, doing business in Clark County, Nevada.

3.      At all times relevant herein, Third-Party Defendant Dennis D'Alessio ("Mr. D'Alessio"), is and was a resident of Orange County, California.

4.      At all times relevant herein, Third-Party Defendant Oliver Duggal ("Mr. Duggal"), is and was a resident of Orange County, California.

5.      At all times relevant herein Third-Party Defendant CalyFx, is and was a California corporation, doing business in Orange County, California.

6.      At all times relevant herein, Third-Party Defendant Universal Brands Inc., ("Universal Brands"), is and was a Nevada corporation, doing business in Clark County, Nevada.

**GENERAL ALLEGATIONS**

**A.  The Legend of Jack Herer**

7.      Jack Herer was the father of the legal cannabis movement, beginning back in the 1970's when he was advocating for hemp as the plant that could save the world. He wrote a book called G.R.A.S.S. in the early 1970's and The Emperor Wears No Clothes which was published in 1985. The Emperor Wears No Clothes was a raging success and is still in print today, now published in 6 languages.  Jack Herer was a prolific public speaker, trekking the world and touting the benefits of hemp and marijuana. In 1992, a Congressional Research Services Report credited him for all of the newly uncovered information regarding the use of hemp to its full utility, and the capacity to change the economy at home and abroad.  He had six children: Barry, Dan, Mark, Chanci, River, and Bene. He died intestate in Oregon on April 15, 2010.

8.      Jack Herer's son, Daniel Herer (hereinafter "Mr. Herer"), has sought to carry on his father's legacy. He and his brother Mark Herer handled the probate action in Oregon following their father's death. The probate attorney was Leonard DuBoff (hereinafter "Mr. DuBoff"), a licensed

attorney and author knowledgeable about the intersection of probate and intellectual property. Mr. DuBoff had all of Jack Herer's intellectual property assigned to an entity called Herer Media & Publishing, Inc. (hereinafter "HMP"), which Mr. Herer owns and operates for the benefit of his siblings, who all have a shared financial interest. In the summer of 2018 when the probate estate for Jack Herer closed, an assignment agreement transferring the Herer IP to HMP was signed and executed. That assignment agreement is not at issue in the present matter.

**B. Dan Herer Established Intellectual Property**

9.      Mr. Herer, through HMP and the Estate of Jack Herer, LLC, has developed a portfolio of intellectual property assets using his father's name, signature, and likeness (hereinafter the "Herer IP"). Herer worked with David Branfman, Esq. (hereinafter "Mr. Branfman"), of Branfman, Mayfield Bustarde Reichenthal LLP, a licensed intellectual property lawyer, to seek registration of various trademarks using Jack Herer's name, likeness, and signature.

10.      On September 11, 2015, HMP was formed.

11.      In June 2017, HMP applied for a trademark in class 034 for THE ORIGINAL JACK HERER for smoker's articles, namely pipes. That application is live as serial number 87482558. There has been a trademark opposition pending for this application.

12.      Also in June 2017, HMP applied for a trademark for the signature of Jack Herer for smoker's articles, namely pipes, in class 034. The application is live as serial number 87482551. There has been a trademark opposition pending for this application.

13.      In November 2017, HMP applied for a trademark in class 025 for JACK HERER for clothing, namely t-shirts. That application is live as serial number 87688394. There has been a trademark opposition pending for this application.

14.      In May 2018, Mr. Herer registered California trademarks for two designs showing Jack Herer's likeness for the category of cannabis flower. Those California trademark registration numbers are 302618 (cannabis flower) and 302619 (cannabis pre-rolled cigarettes).

15.      On June 29, 2018, the Estate of Jack Herer, LLC was formed. The formation was consistent with the closing of Jack Herer's probate estate.

16.    In December 2018, HMP applied for a trademark JACK HERER in class 035 for an online retail store for hemp products. That application is live as serial number 87482579. There has been a trademark opposition pending for this application.

17.    In August 2019, HMP applied for the mark JACK HERER for beer in class 032. The beer was sold in more than 20 states. That mark registered in March 2021 as registration number 6297246.

18.    In December 2020, HMP applied for a trademark for JACK HERER CUP in class 041 for entertainment services, namely a live cannabis award show. That application is live as serial number 90407951. Herer had to fight a separate lawsuit against an individual named Randall Foreman (hereinafter "Mr. Foreman") who operated the event called the Jack Herer Cup and sold it to HMP, but then breached the contract by failing to transfer control of the company. Herer and HMP prevailed in state court and now own Jack Herer Cup, LLC and all of its associated accounts.

19.    Simultaneously, Mr. Foreman filed a trademark opposition action which was stayed until the outcome of the state court matter and has since been dismissed. Now that the Jack Herer Cup, LLC belongs to HMP, the United States Patent and Trademark Office (hereinafter "USPTO") has resumed examination of this trademark and Mr. Herer expects it to register shortly.

20.    In January 2021, HMP applied for a trademark for JACKHERER.COM for class 035 for an online retail store. The application is live as serial number 90446800.

21.    In June 2022, HMP applied to the USPTO for a trademark for the signature of Jack Herer for electronic cigarette liquid containing hemp in class 034. That application is live as serial number 97446368. Also in June 2022, HMP applied to the USPTO for a trademark for THE ORIGINAL JACK HERER for electronic cigarette liquid containing hemp in class 034. That application is live as serial number 97446344. That same month, HMP applied to the USPTO for a trademark for JACK HERER for electronic cigarette liquid containing hemp in class 034. That application is live as serial number 97446312.

22.    Collectively, these applications and registrations are referred to and comprise the Herer IP.

285923833v.1

23.    In addition, there is an ongoing dispute with Mr. Dennis Specht (hereinafter "Mr. Specht"), a former associate of Jack Herer. Mr. Specht is the registrant of the trademark JACK HERER LEGACY for an online retail store featuring hemp products. It is serial number 97692105. Mr. Specht owns USPTO registration number 5581110 for JACK HERER LEGACY for e-cigarette liquid containing hemp. In 2019, Mr. Herer had an agreement with Mr. Specht to purchase these trademarks for the Herer family, but was unable to make the requisite monthly payments and renegotiated with Specht multiple times. At Mr. D'Alessio and Mr. Duggal's instruction, Mr. Herer breached the contract with Mr. Specht by ceasing payments altogether. Mr. Specht is still willing to sell to Mr. Herer, but he demands a much higher price now.

**C.  HMP Sought a Partner**

24.    As Mr. Herer worked to develop the Herer IP portfolio, he relied on the help of others who loaned him money and advanced him legal fees. Eventually, Mr. Herer and HMP came to owe approximately $1,500,000.00 to various creditors. Despite his best efforts, Mr. Herer was never able to raise the necessary capital to infuse into HMP to monetize the Jack Herer name and make it a major player in the cannabis industry, as Mr. Herer had envisioned it to be.

25.    On June 24, 2022, Mr. Herer began talks with Mr. D'Alessio and Mr. Duggal to fund two new companies to monetize the Herer IP portfolio and help create the widespread impact that Jack Herer had envisioned.  At this time, Mr. D'Alessio already owned another cannabis brand called CalyFx, and sought to increase CalyFx's profile by aligning it with the established name of Jack Herer.

26.    Mr. Herer, Mr. D'Alessio, and Mr. Duggal undertook what was intended to be a due diligence period. Mr. Herer provided Mr. D'Alessio and Mr. Duggal with all of the documents associated with HMP, including a list of all debts and a description of all existing business relationships. Mr. Herer began forwarding Mr. D'Alessio and Mr. Duggal samples of the packaging he used to sell cannabis flower and pre-roll joints in California and Colorado. Mr. Herer also shared a power point presentation with Mr. D'Alessio and Mr. Duggal which showcased the development of the Jack Herer brand. He also provided Mr. D'Alessio and Mr. Duggal with information about

the trademark opposition actions and the dispute over the Jack Herer Cup, LLC, and its associated trademark. Mr. Herer, Mr. D'Alessio and Mr. Duggal had extensive discussions wherein Mr. Herer also disclosed the specific issues concerning the trademark opposition actions, and the legal bills associated with the defense of those oppositions. He also disclosed the legal debt associated with the Jack Herer Cup, LLC breach of contract action, which amounted to several hundred thousand dollars.

27.     As part of their ongoing discussions, Mr. Herer, Mr. D'Alessio and Mr. Duggal held a whiteboard session where Mr. Herer laid out all preexisting debts, totaling approximately $1,500,000.00, and all of which Mr. Herer provided support for during the due diligence phase. Mr. D'Alessio and Mr. Duggal represented to Mr. Herer that the preexisting debts would be resolved in thirty (30) days if he did business with Mr. D'Alessio, and agreed to sign over organizational control immediately.

**D.  The Letter of Intent**

28.     On July 17, 2022, Mr. Duggal drafted a Letter of Intent ("LOI"), before sending it to Mr. Herer and Mr. D'Alessio for signature. Mr. Herer provided his electronic signature later that day, without any representation by counsel. The LOI contained an agreement whereby "D'Alessio, CalyFx, and or a legal entity of which D'Alessio is the majority owner " [sic] as Party A and Herer and his companies as Party B would form a new company, Company C, that Herer would own 51% of and D'Alessio "and or CalyFx," or some other entity would own 49%. Party A (D'Alessio, CalyFx, or some other entity) agreed to provide "base capital" investment to pay HMP and Mr. Herer's preexisting debts of up to $1,500,000.00, in exchange for Mr. Herer assigning all intellectual property to Company C. That $1,500,000.00 of base capital was specifically referenced for paying Mr. Herer's preexisting debts, and was consideration for Mr. Herer assigning the intellectual property to Company C.

29.     At first, Mr. Herer intended to give Mr. D'Alessio 25% of the new company they intended to form together, and then eventually have D'Alessio earn in to get up to 49%. Mr. Duggal repeatedly represented to Mr. Herer that Mr. D'Alessio was going to invest $20,000,000.00 into the

company rapidly and that he would be more comfortable to come in with 49% ownership in the new company, in order to "eliminate risk." However, Mr. Duggal knew at the time that his statement was false. He knew that Mr. D'Alessio had no intention to perform and invest $20,000,000.00 into the company. Instead, he provided Mr. Herer with false verbal representations in order to induce him into signing the LOI. All of the misrepresentations were verbal during telephone and video conference calls, with Mr. Duggal careful never to memorialize these representations in writing.

30.    Mr. Herer was uncomfortable giving Mr. D'Alessio, a relatively unknown person to him and the cannabis industry at large, such a large commitment up front before he had actually put in any money. However, Mr. D'Alessio coerced Mr. Herer into going along with the plan by personally telling Mr. Herer that he would invest $5,000,000.00 into the company right up front. Mr. D'Alessio repeated these misrepresentations in-person at his home, on the phone, and over video teleconference at different points in June and July 2022. Mr. Herer never would have agreed to the terms set forth in the LOI if he had known that that Mr. D'Alessio and Mr. Duggal had lied to him about what efforts Mr. D'Alessio would make to support the new company. Mr. D'Alessio and Mr. Duggal both knew that Mr. D'Alessio had no intention of putting $20,000,000.00 or even $5,000,000.00, into the Jack Herer brands.

**E.  The Parties Began Working Together**

31.    On July 25, 2022, Mr. Herer, Mr. D'Alessio and Mr. Duggal met with Mr. Herer's general counsel, Ms. Katy Young (hereinafter "Ms. Young"), in order to discuss ongoing trademark disputes.

32.    In August 2022, Mr. Herer began introducing Mr. D'Alessio and Mr. Duggal as his new partners in the Herer brands. He introduced them to Mr. Branfman, the trademark lawyer who had been handling the Herer IP portfolio. Mr. D'Alessio and Mr. Duggal attempted to renegotiate the debt owed to Mr. Branfman's firm, so that the firm would continue to do work for Herer. Mr. Branfman's firm insisted on a new engagement agreement, and Mr. D'Alessio paid Mr. Branfman's firm approximately $5,000 to help both Mr. D'Alessio and Mr. Duggal better understand the state of the trademarks and the documents concerning the Jack Herer Legacy trademarks and Dennis

Specht, the owner of the Jack Herer Legacy trademarks. At the time, Mr. Herer had a contract in place with Mr. Specht to buy the Jack Herer Legacy trademarks, but Mr. D'Alessio and Mr. Duggal instructed Mr. Herer to breach that contract by ceasing to make payments to Mr. Specht, in the hope that Mr. D'Alessio and Mr. Duggal could negotiate a better deal.

33.     The contract with Mr. Specht is currently terminated due to breach. Mr. Specht wishes to give control of the trademarks to Mr. Herer out of respect for his father, but does not wish to give control to Mr. D'Alessio. Mr. Branfman's firm has also refused to do any more work due to non-payment for past work.

34.     In August 2022, Mr. D'Alessio began plans to wrap a bus he owned by CalyFx with additional advertising for the Herer brands. However, he only ended up utilizing temporary overlays on small portions of the bus. Upon information and belief, the expense for this effort was minor.

35.     Shortly thereafter, Mr. D'Alessio through newly created entity Herer Brands, Inc., began to negotiate a contract with salesperson Mr. Brian Kolodny (hereinafter "Mr. Kolodny"), who Mr. Herer already knew through his contacts in the cannabis industry and had previously worked with. Mr. D'Alessio negotiated an independent contractor agreement with Mr. Kolodny and subsequently breached it almost immediately by not paying Mr. Kolodny as he had promised.

36.     In September 2022, Mr. Herer sent Mr. D'Alessio his American Express credit card statement, which showed the balance owed for expenses Mr. Herer had incurred in the normal course of promoting the Herer brands. He also forwarded an invoice for packaging that Mr. Herer's designer had worked on before Mr. D'Alessio got involved. Mr. D'Alessio reimbursed Mr. Herer for expenses and eventually paid the packaging invoice, although four months late.

**F.  The Estate of Jack Herer, LLC Falsified Documents**

37.     Around this time, Mr. D'Alessio and Mr. Duggal discovered that some of the Herer IP was still controlled by the Estate of Jack Herer, LLC, and not HMP.

38.     In an attempt to gain control of the Herer IP controlled by the Estate of Jack Herer, LLC, Mr. Duggal cooked up a scheme to create and then execute a backdated operating agreement, with the sole intent of gaining control of the remaining Herer IP. In doing so, Mr. Duggal identified

that the original operating agreement for Estate of Jack Herer, LLC required unanimous consent to contract, which would have required consent of Jack Herer's widow and all six (6) of his children, in order to assign any trademarks or intellectual property. Mr. Duggal drafted the new operating agreement and then directed Mr. Herer to drive all over California and Oregon collecting original wet signatures from each of his family members, so that there would be no electronic record of when the document was created or signed. The new operating agreement was falsely backdated to prior to the actual dates of signature, appointed Mr. Herer as the manager for the Estate of Jack Herer, LLC, and allowed for majority vote, rather than unanimous, in order to consent to contracts. The first draft of the new operating agreement was so poorly written, that Jack Herer's widow, Ms. Regina Herer, refused to sign it. Mr. Duggal later had to correct the numerous errors contained therein, before sending a new copy to Mr. Herer, which he then had to retrieve from a Staples store in Sonora, California, before obtaining Ms. Herer's signature. As a result, the new assignment agreement was procured by fraud.

39.     In addition to the new operating agreement, Mr. Duggal also drafted an assignment agreement that purported to assign the Herer IP to Herer Brands, Inc. Finally, Mr. Duggal also drafted a general release, which purported to release Herer Brands, Inc. of any wrongdoing, but attempted to do so without any exchange of consideration. Mr. Duggal also directed Mr. Herer to obtain the original wet signatures for each of his siblings on the assignment agreement and general release. Despite Mr. Herer's best efforts, he was unable to obtain the signatures of his younger brother, Mr. Bene Herer, and as a result, failed to ever obtain unanimous consent for the new operating agreement, assignment agreement or general release.

40.     On September 22, 2022, Mr. Herer emailed Mr. D'Alessio a signature page for the backdated operating agreement, the new assignment agreement, and the general release, containing the signatures of all Herer family members, besides Bene Herer. Mr. D'Alessio and Mr. Duggal then inserted a signature date for the backdated operating agreement of August 22, 2018, despite no signatures being obtained until more than four (4) years later, in September 2022.

/ / /

**G.  The Definitive Asset Merger Agreement**

41.    On September 27, 2022, Mr. Herer and Mr. D'Alessio executed a Definitive Asset Merger Agreement ("DAMA") that Mr. Duggal had drafted. The signatories were Mr. D'Alessio, as "an authorized person on behalf of the corporation" and Mr. Herer. It is unknown what corporation Mr. D'Alessio signed on behalf of. The DAMA contained terms similar to the LOI, except that Mr. D'Alessio and Mr. Duggal incorporated a subtle change into the terms of the DAMA that would effectively eliminate any obligation to provide the initial base capital contribution and instead allowed for the additional assets referenced above to now comprise the entirety of their obligated contribution. Specifically, Mr. D'Alessio switched the additional asset contribution, consisting of $650,000.00 - $925,000.00 in industry consulting and trade specific expertise and education including a comprehensive GAP analysis, consumer market research, community program development, IT analysis and retraining, and sales and marketing program systems implementation, as well as, $500,000.00 or more in lines of credit for leveraging existing vendor relationships to support manufacturing supply chain. In contrast to the LOI which stated that these additional contributions would be made ***in addition to*** the base capital investment, the DAMA now stated that the additional contributions would be made ***as part of*** the base capital investment.

42.    Once again, Mr. Duggal induced Herer to sign the DAMA with promises that Mr. D'Alessio would inject $20,000,000.00 into the project in short order.

43.    Mr. D'Alessio also induced Mr. Herer to sign the DAMA by falsely promising that he would ensure that the Herer family would be financially taken care of and that he would relieve Mr. Herer of his preexisting debts within thirty (30) days.

**H.  The Professional Services Agreement**

44.    As part of the negotiation leading up to the LOI and later the DAMA, the parties discussed how to compensate Mr. Herer for his work promoting the Herer brands. Mr. Herer insisted on a written professional services agreement, which was contemplated by both the LOI and the later DAMA. However, no such agreement ever came. Mr. Herer and Mr. D'Alessio reached a verbal agreement that as they were building the company Mr. D'Alessio would advance Mr. Herer funds

285923833v.1

based on future profit dividends at $10,000.00 per month, but limited solely to Mr. Herer's household income needs. These payments were characterized as loans and were to be repaid to the company through future dividends owed to Mr. Herer. As future dividends were to be paid, Mr. D'Alessio would receive the equivalent of what he advanced Mr. Herer during the start up before Mr. Herer received any further dividends. As the company became solvent and able to support itself, Mr. Herer's monthly pay was intended to be the equivalent of $10,000.00 net per month after taxes.

45.   Mr. Herer began serving in the aforementioned business development role. Mr. D'Alessio in turn started paying Mr. Herer for his work with checks featuring notes listing "loan," "adv. on dividends," and "loan to Dan from Herer Brands when opened." Mr. Herer submitted his expenses directly to Mr. D'Alessio, who reimbursed him for some, but not all, of those expenses.

46.   On August 10, 2022, Mr. D'Alessio wrote a $5,000.00 check to Mr. Herer, characterized as a loan in the subject line. The check was written from D'Alessio Investments, LLC. On October 3, 2022, D'Alessio Investments, LLC wrote Herer a $6,000.00 check for "Adv. on Div. Herer Brands." On October 10, 2022, D'Alessio Investments, LLC wrote Herer a check for $9,600.00, which was reimbursement for expenses Herer had incurred in developing business. Also on October 10, 2022, D'Alessio Investments, LLC wrote Mr. Herer another check for $6,700.00. On October 28, 2022, D'Alessio Investments, LLC wrote another check to Mr. Herer, this time for the $10,000.00 they had agreed on, but the subject line said "Loan to Dan from/Herer Brands when opened."

47.   Mr. D'Alessio subsequently ceased paying Mr. Herer from October 28, 2022 until January 2023, when Mr. Herer formally terminated their agreement. On January 23, 2023, D'Alessio Investments, LLC wrote Herer a check for $15,000.00, after Mr. Herer had made repeated complaints about nonpayment from Mr. D'Alessio. Finally, on February 28, 2023, D'Alessio Investments, LLC wrote Mr. Herer a check for $7,500.00.

48.   In addition, through D'Alessio Investments, LLC, Mr. D'Alessio wrote Mr. Herer several checks to cover Mr. Herer's expenses incurred as part of his planned business development role within the new company. On September 7, 2022, D'Alessio Investments, LLC provided another

check to Mr. Herer for $7,707.82, with the subject line as "American Express," indicating that it was a reimbursement check. On October 4, 2022, D'Alessio Investment, LLC made a payment on Mr. Herer's American Express card by phone in the amount of $3,876.56. On October 4, 2022, D'Alessio Investments, LLC wrote another check to Mr. Herer for $7,687.00 for reimbursement. On November 4, 2022, D'Alessio called American Express to make a payment on Mr. Herer's behalf in the amount of $2,493.25. On March 3, 2023, D'Alessio Investments, LLC wrote Mr. Herer five separate checks for reimbursement after he had complained further about Mr. D'Alessio's failure to make timely payments. The five (5) checks from March 3, 2023 totaled $6,232.66.

49.     In total, Mr. D'Alessio has paid Mr. Herer a total of $87,797.29. At no point did Mr. D'Alessio ever manage to pay Mr. Herer the agreed-upon $10,000 per month, and when he did pay, it was a loan or an advance for only a portion of the agreed-upon amount.

## I.   Mr. D'Alessio Did Not Understand the Cannabis Industry

50.     Despite already owning his own cannabis brand, Mr. D'Alessio lacked a basic understanding of the laws around growing, processing, transporting, marketing, or selling cannabis products. Mr. D'Alessio also did not understand that the supply chain in the cannabis industry works on a consignment model. Instead, Mr. D'Alessio routinely insisted on cash up front, which resulted in sales stagnating. Mr. D'Alessio's only financial investment came in the form of initial product acquisition, however Mr. D'Alessio would unexplainably expect immediate cash returns on his money.

51.     Mr. D'Alessio even sponsored and attended industry events with the use of a gigantic double-decker bus, but with no actual products to show or sell. The lack of product was extraordinarily damaging to the brand and created many uncomfortable conversations with retailers and event organizers.

52.     In addition, Mr. D'Alessio recklessly commingled funds between his many companies, and seemed to have no understanding of the impact of IRS section 280e, a well-known tax provision that only allows cannabis businesses to write off cost of goods sold, resulting in extremely high taxes.

285923833v.1

53.     Mr. D'Alessio also refused to do business with Mr. Herer's distribution contact, and disregarded every other distribution company that Mr. Herer presented, representing that he either did not like the terms or thought the cost was too high. After exhausting all legitimate distributor that were available, Mr. D'Alessio insisted that the company store their products at a facility in downtown Los Angeles owned by Caliwanna, in order to save cost. Caliwanna was to manufacture pre-rolls, package, and store the Herer products.

54.     On or about November 23, 2022, all of the Jack Herer cannabis products were stolen from Caliwanna. The distributor had not provided the shipping manifest for products that had been sold, so Mr. Herer had no record of what cannabis was stolen. In response, Mr. D'Alessio and Mr. Duggal blamed Mr. Herer for the theft.

55.     Through the remainder of 2022, the parties' the parties remained at odds over the theft at the Caliwanna facility. Mr. D'Alessio and Mr. Duggal continued to blame Mr. Herer for the theft, and in response, Mr. D'Alessio refused to pay one of their established vendors. Mr. D'Alessio and Mr. Duggal insisted that all business had to stop until the Caliwanna theft had been solved. On December 9, 2022, Mr. Herer texted Mr. D'Alessio and pleaded for him to pay one of their vendors, so as to avoid further damage to their reputation for non-payment.

**J.  Mr. D'Alessio Breaches the Definitive Assert Merger Agreement**

56.     Around this time Mr. D'Alessio reengaged with Mr. Dennis Specht in an attempt to purchase the Jack Herer Legacy trademarks. However, instead of paying Mr. Specht to purchase the Jack Herer Legacy trademarks, Mr. D'Alessio and Mr. Duggal forced Mr. Herer to renegotiate with Mr. Specht again in an attempt to lower the monthly payment amount. When the attempts to renegotiate were unsuccessful, Mr. D'Alessio and Mr. Duggal instructed Mr. Herer to stop paying Mr. Specht altogether, thereby causing Mr. Herer to breach the contract to purchase the Legacy trademarks and damaging his longstanding relationship with Mr. Specht. Their tactic did not work and resulted in the termination of a valuable contract for intellectual property that Mr. Herer had already paid hundreds of thousands of dollars towards.

57.     On December 8, 2022, Mr. Herer texted Mr. D'Alessio and Mr. Duggal begging them to pay one of their vendors who cultivated the cannabis that was being sold under the brand name. In response, Mr. Duggal reached out to the vendor and falsely claimed that Mr. Herer was no longer involved with vendor relations and that all communications needed to go through him. Mr. Duggal also forbade Mr. Herer from reaching out to the vendor again.

58.     Over the course of December 2022, Mr. Herer came to realize his mistake, and recognized that Mr. D'Alessio had no intention of upholding his end of the bargain, as set forth in the terms contained within DAMA.

**K.  Mr. Herer Terminated the Definitive Assert Merger Agreement Due to Mr. D'Alessio's Material Breach**

59.     On December 29, 2022, Mr. Herer emailed Mr. D'Alessio to inform him that he was in breach of the DAMA, and demanded that Mr. D'Alessio pay him 1) the monthly compensation owed to him as part of the agreed upon professional services contract; and 2) the $1,500,000.00 base capital contemplated by both the LOI and the DAMA. In response to Mr. Herer's written demand, Mr. D'Alessio made no efforts to perform the contract. Instead, Mr. D'Alessio and Mr. Duggal began denying that Mr. Herer had disclosed any debts and took the position that Mr. D'Alessio was not responsible for any of Mr. Herer's preexisting debts.

60.     Seeing no path forward, on January 13, 2023, Mr. Herer emailed Mr. D'Alessio in order to formally terminate the DAMA in response to Mr. D'Alessio's repeated failure to perform according to the terms of the DAMA itself. As part of his email, Mr. Herer specifically stated that the reasons for terminating the DAMA were: 1) failure to form the new company that Mr. Herer would own 51% of, as considered in the DAMA; 2) failure to execute a professional services contract for Mr. Herer, as contemplated by the DAMA; 3) failure to contribute the $1,500,000.00 base capital investment, in order to satisfy preexisting debts, as contemplated by the DAMA; 4) disruption of existing business relationships; and 5) failures associated with marketing and supply chain issues.

61.     Nevertheless, in the interest of the great potential that still existed, the parties continued discussing their issues. In February 2023, Mr. D'Alessio and Mr. Herer met to try to settle their differences and bring resolution to this matter. Unfortunately, Mr. D'Alessio continued with his old ways and failed to cure any of the material breaches that Mr. Herer had identified in his termination email from January 13, 2023. Instead, Mr. D'Alessio and Mr. Duggal continued to hound Mr. Herer in an attempt to get him to continue working with them.

62.     In April 2023, Mr. Herer had his general counsel, Ms. Young, call a meeting with Mr. D'Alessio and Mr. Duggal. The meeting was scheduled to be conducted via video conference on April 5, 2023. In anticipation thereof, Ms. Young reiterated to Mr. D'Alessio and Mr. Duggal that the DAMA had been terminated in January of that year. Mr. D'Alessio admitted that he had not contributed the $1,500,000.00 base capital investment, but then stated that the DAMA was not the governing document for the parties' agreement.

63.     Mr. Herer then noticed a shareholder meeting for Herer Brands, Inc. by email, since he reasonably believed that he owned 51% of the new company, as contemplated in both the LOI and the DAMA. Instead, Mr. D'Alessio wrote back and informed Mr. Herer that he did not have the power to call a shareholder meeting.

64.     On April 12, 2023, Mr. D'Alessio wrote to Ms. Young in order to reject Mr. Herer's formal request through her to review the books and records of Herer Brands, Inc. Mr. D'Alessio stated that he was unaware of any documents that would give Mr. Herer the authority to make such a demand. Upon information and belief, Mr. D'Alessio never formed the corporation that the parties had agreed that Mr. Herer would own 51% of. The shareholder meeting that Mr. Herer noticed did not go forward because Mr. D'Alessio failed to attend.

65.     To date, Mr. D'Alessio has never provided Mr. Herer with access to the books and records for the new company that he supposedly owns 51% of, or Herer Brands, Inc. The parties ceased communication shortly thereafter, before Herer Brands, Inc. sued Mr. Herer by initiating the present action.

/ / /

1

### L.  D'Alessio is Infringing on Herer's Intellectual Property

2          66.     The Herer IP portfolio contains valid and protectable trademarks that Mr. D'Alessio

3   has no right to use. Mr. D'Alessio never paid the $1,500,000.00 base capital investment, so the

4   intellectual property was never transferred out of Herer Media & Publishing, Inc. The backdated

5   operating agreement and assignment agreement were ineffective to assign the Herer IP from Estate

6   of Jack Herer, LLC because they were procured by fraud and failed to obtain the requisite

7   unanimous consent, as Mr. Bene Herer refused to sign. Accordingly, Herer Brands, Inc. does not

8   own any of the Herer IP. Nevertheless, Mr. D'Alessio is still driving the bus around with the Jack

9   Herer art on the side. He also continues to appear on podcasts advertising CalyFx and the Jack Herer

10  brands together.

11                            <u>**FIRST CAUSE OF ACTION**</u>

12              **Fraud (Third-Party Defendants D'Alessio, Duggal and CalyFx)**

13          67.     Mr. Herer repeats, realleges, and incorporates by reference, his above allegations as

14  though fully set forth herein.

15          68.     In an attempt to gain control of the Herer IP controlled by the Estate of Jack Herer,

16  LLC, Mr. Duggal drafted a new operating agreement and then directed Mr. Herer to drive all over

17  California and Oregon collecting original wet signatures from each of his family members, so that

18  there would be no electronic record of when the document was created or signed. The new operating

19  agreement was falsely backdated to before the actual dates of signature, appointed Mr. Herer as the

20  manager for the Estate of Jack Herer, LLC, and allowed for majority vote, rather than unanimous,

21  in order to consent to contracts.

22          69.     Mr. Duggal also drafted a fraudulent assignment agreement that purported to assign

23  the Herer IP to Herer Brands, Inc, despite having no authority to do so. Similarly, Mr. Duggal also

24  drafted a general release, which purported to release Herer Brands, Inc. of any wrongdoing, but

25  attempted to do so in without any exchange of consideration.

26

27

28

70.     Mr. Duggal also directed Mr. Herer to drive across California and Oregon, in order obtain the original wet signatures for each of his siblings on the new operating agreement, assignment agreement and general release.

71.     Mr. Herer was unable to obtain the signatures of his younger brother, Mr. Bene Herer, and as a result, failed to ever obtain unanimous consent for the new operating agreement, assignment agreement or general release.

72.     On September 22, 2022, Mr. Herer emailed Mr. D'Alessio a signature page for the backdated operating agreement, the new assignment agreement, and the general release, containing the signatures of all Herer family members, besides Bene Herer. Mr. D'Alessio and Mr. Duggal then inserted a signature date for the backdated operating agreement of August 22, 2018, despite no signatures being obtained until more than four (4) years later, in September 2022.

73.     Mr. D'Alessio, individually and as the owner of CalyFx, and Mr. Duggal intended to induce Mr. Herer to engage in fraud in an attempt to procure control of the Herer IP.

74.     Mr. Herer justifiably relied upon the representations of Mr. D'Alessio and Mr. Duggal regarding the new fraudulent documents, and believed that they were helping him to establish what was believed to be a legitimate business enterprise.

75.     As a result of Mr. D'Alessio and Mr. Duggal's actions, inactions and fraud Mr. Herer has been damaged by their actions. He has suffered damage to his business relationships, damage to his reputation by associating with Mr. D'Alessio and Mr. Duggal, loss of status within his business community, and monetary damages. In addition, Mr. Herer has been required to retain an attorney and is entitled to his costs and attorney's fees herein.

## SECOND CAUSE OF ACTION

**Fraudulent Inducement to Contract (Third-Party Defendants D'Alessio, Duggal and CalyFx)**

76.     Mr. Herer repeats, realleges, and incorporates by reference, its above allegations as though fully set forth herein.

77.     Mr. D'Alessio and Mr. Duggal made false representations to Mr. Herer when Mr. D'Alessio, personally and as the owner of CalyFx, that he would invest $5,000,000.00, in order resolve Mr. Herer's preexisting debts within thirty (30) days, and financially provide for the Herer family as part of their negotiations. Mr. D'Alessio and Mr. Duggal repeated these false statements to Mr. Herer throughout the summer and fall of 2022 in person, on the phone, and over video conference calls.

78.     In authoring the LOI, Mr. D'Alessio and Mr. Duggal initially misrepresented that they would contribute a $1,500,000.00 in base capital to resolve Herer's existing debts, in addition to additional assets of $650,000.00 - $925,000.00 in industry consulting and trade specific expertise and education including a comprehensive GAP analysis, consumer market research, community program development, IT analysis and retraining, and sales and marketing program systems implementation, as well as, $500,000.00 or more in lines of credit for leveraging existing vendor relationships to support manufacturing supply chain. However, when it came time to later author the DAMA, Mr. D'Alessio and Mr. Duggal incorporated a subtle change into the terms of the DAMA that would effectively eliminate any obligation to provide the initial base capital contribution and instead allowed for the additional assets referenced above to now comprise the entirety of their obligated contribution.

79.     Mr. Duggal misrepresented to Mr. Herer that Mr. D'Alessio would quickly invest $20,000,000.00 to support the Herer brands in the first (30) days. He repeated these same false statements to Mr. Herer throughout the summer and fall of 2022. His statements were oral by phone and over zoom.

80.     Mr. D'Alessio, individually and as the owner of CalyFx, and Mr. Duggal knew these representations to be false, as their true intention was to attempt to gain control of the Herer IP without paying for it, or compensating Mr. Herer in the manner they had initially discussed.

81.     Mr. D'Alessio, individually and as the owner of CalyFx, and Mr. Duggal intended to induce Mr. Herer to act in reliance upon their misrepresentations. They knew that Mr. Herer was in a difficult financial position and they exploited that fact with only their own benefit in mind.

285923833v.1

82.     Mr. Herer justifiably relied upon the representations of Mr. D'Alessio and Mr. Duggal regarding the outsized investments, as Mr. D'Alessio had demonstrated considerable personal wealth, along with other successful business ventures in order to tout his own business acumen.

83.     As a result of Mr. D'Alessio and Mr. Duggal's actions, inactions and fraud, Mr. Herer has been damaged by such reliance. He has suffered damage to his business relationships, damage to his reputation by associating with Mr. D'Alessio and Mr. Duggal, loss of status within his business community, and monetary damages including having to pay a higher price for the Jack Herer Legacy trademarks.

84.     As a result of Mr. D'Alessio actions and inactions, Mr. Herer has been required to retain an attorney and is entitled to his costs and attorney's fees herein.

## THIRD CAUSE OF ACTION

### Breach of Contract (Third-Party Defendants D'Alessio and CalyFx)

85.     Mr. Herer repeats, realleges, and incorporates by reference, its above allegations as though fully set forth herein.

86.     In the alternative to the first and second causes of action, if the Court determines that the contract was not procured by fraud, Herer pleads as follows:

87.     As part of the DAMA, Mr. D'Alessio promised to contribute $1,500,000.00 in base capital to resolve Mr. Herer's preexisting debts, as consideration to purchase the Herer IP. As part of the DAMA, Mr. D'Alessio promised to provide Mr. Herer with a professional services agreement for Mr. Herer's work as Chief Business Development Officer in promoting the Herer IP. The professional services agreement was intended to provide Mr. Herer compensation of $10,000.00 per month.

88.     Mr. D'Alessio failed to ever contribute the agreed upon $1,500,000.00 base capital amount, and by January 2023 began to insist that he was no longer responsible for satisfying any of Mr. Herer's preexisting debts. Mr. D'Alessio never presented Mr. Herer with a professional services agreement, and instead began to loan or advance funds to Mr. Herer for his work. Mr. D'Alessio

further breached the professional services agreement by failing to ever pay Mr. Herer the $10,000.00 in monthly compensation that they had agreed on.

89.     As a result of Mr. D'Alessio breach of the DAMA, Mr. Herer has incurred additional damages. Mr. Herer's outstanding debts remain unpaid while interest continues to accrue. Mr. Herer was not paid for his work developing the Herer brands.

90.     As a result of Mr. D'Alessio actions and inactions, Mr. Herer has been required to retain an attorney and is entitled to his costs and attorney's fees herein.

**FOURTH CAUSE OF ACTION**

**Trademark Infringement (Third-Party Defendants D'Alessio, Universal Brands, Inc., and CalyFx)**

91.     Mr. Herer repeats, realleges, and incorporates by reference, its above allegations as though fully set forth herein.

92.     Mr. Herer, through HMP and Estate of Jack Herer, LLC, has valid, protectable trademarks as described in paragraphs 11-22 of the Counter-Claim / Third-Party Complaint. While only one is registered, HMP has common law rights to the marks.

93.     HMP still owns the trademarks JACK HERER, THE ORIGINAL JACK HERER, JACK HERER CUP, and JACKHERER.COM as described above in paragraphs 11-22. These trademarks were never assigned to Mr. D'Alessio, Universal Brands, Inc., or CalyFx, because Mr. D'Alessio failed to ever contribute the requisite the $1,500,000.00 million base capital amount, resulting in the termination of the DAMA.

94.     Mr. D'Alessio, Universal Brands, Inc., and CalyFx, continue to utilize the JACK HERER and THE ORIGINAL JACK HERER trademarks, in order to sell cannabis without Mr. Herer's consent. Mr. D'Alessio's omission to state that the contract with Herer has been terminated, and subsequent statements that he has right to these trademarks, is likely to cause confusion among ordinary consumers as to the source, affiliation, and approval of the goods. The products that Mr. D'Alessio, Universal Brands, Inc., and CalyFx are marketing and selling give the impression that the source of the cannabis is affiliated with the famous Jack Herer, and that the Herer family

285923833v.1

1    approves of those goods. In reality, Mr. D'Alessio, Universal Brands, Inc., and CalyFx have never

2    possessed any of the Herer IP and have never received the approval of Mr. Herer to market their

3    goods.

4         95.    Mr. D'Alessio, Universal Brands, Inc., and CalyFx's unauthorized exploitation of the

5    Herer IP has caused Mr. Herer damages in the form of lost sales that Mr. D'Alessio is usurping, in

6    addition to irreparable damage to Mr. Herer's reputation for his unwilling involvement in this

7    unauthorized venture.

8                           **FIFTH CAUSE OF ACTION**

9    **Declaratory Relief (Counter-Claimant Herer Brands, Inc., & Third-Party Defendants**

10                 **D'Alessio, Duggal, Universal Brands, Inc., and CalyFx)**

11        96.    Mr. Herer repeats, realleges, and incorporates by reference, its above allegations as

12   though fully set forth herein.

13        97.    A justifiable controversy exists regarding the Herer IP, between Herer Brands, Inc.,

14   Mr D'Alessio, Mr. Duggal, CalyFx, and Universal Brands, Inc., on one hand and Mr. Herer on the

15   other hand.

16        98.    The parties disagree over their respective rights to the Herer IP pursuant to the terms

17   of the DAMA.

18        99.    Mr. Herer asserts that none of the Herer IP ever transferred to Herer Brands, Inc., Mr

19   D'Alessio, Mr. Duggal, CalyFx, and Universal Brands, Inc., because of Mr. D'Alessio, Mr. Duggal

20   and CalyFx's fraud, fraudulent inducement, and a breach of the promise to contribute the agreed

21   upon $1,500,000.00 base capital investment.

22        100.   The issue is ripe for judicial determination as Herer Brands Inc. initiated the present

23   suit by asserting causes of action against Mr. Herer.

24        101.   Mr. Herer prays that the Court determine the parties' relative rights under the DAMA.

25   / / /

26   / / /

27   / / /

28

1    **WHEREFORE**, Defendant / Counter-Claimant / Third-Party Plaintiff DAN HERER prays

2  for judgment against Plaintiff / Counter-Defendant HERER BRANDS, INC., and Third-Party

3  Defendants DENNIS D'ALESSIO, OLIVER DUGGAL, CALYFX and UNIVERSAL BRANDS,

4  INC., as follows:

5         A.      For all damages for indemnification, contribution according to proof and all general,

6                 special, consequential, incidental damages in an amount in excess of $15,000.

7         B.      For pre-judgment and post-judgment interest at the rate provided by law;

8         C.      For attorney's fees and costs as provided by law and/or contract;

9         D.      For declaratory relief concerning the ownership of the Herer IP and

10        E.      For all further relief, legal or equitable, which the Court deems just and proper in the

11                premises.

12                            **DEMAND FOR JURY TRIAL**

13       Dan Herer hereby demands a trial by jury of all of the issues in this case.

14       DATED this 14th day of August, 2023

15                                   WILSON, ELSER, MOSKOWITZ,
16                                   EDELMAN & DICKER LLP

17                              By: */s/ Jonathan A. Rich, Esq.*
18                                   KAREN L. BASHOR, ESQ.
                                     Nevada Bar No. 11913
19                                   JONATHAN A. RICH, ESQ.
                                     Nevada Bar No. 15312
20                                   6689 Las Vegas Boulevard, South, Suite 200
                                     Las Vegas, NV  89119
21                                   *Attorneys for Defendant Daniel Herer*

22

23

24

25

26

27

28

1

2

## **CERTIFICATE OF SERVICE**

3      Pursuant to Fed. R. Civ. P. 5(b), I certify that I am an employee of WILSON ELSER MOSKOWITZ

4  EDELMAN & DICKER LLP, and that on this 14th day of August, 2023, I served a true and correct copy

5  of the foregoing **DEFENDANT DANIEL HERER'S ANSWER TO PLAINTIFF'S**

6  **COMPLAINT; COUNTERCLAIM AGAINST PLAINTIFF HERER BRANDS, INC.;**

7  **THIRD-PARTY COMPLAINT AGAINST DENNIS D'ALESSIO, OLIVER DUGGAL,**

8  **CALYFX, UNIVERSAL BRANDS, INC., AND D'ALESSIO INVESTMENTS, LLC;**

9  **DEMAND FOR JURY TRIAL** as follows:

10

11  ☐      by placing same to be deposited for mailing in the United States Mail, in a sealed
       envelope upon which first class postage was prepaid in Las Vegas, Nevada;

12

13  ☒      via electronic means by operation of the Court's electronic filing system, upon each
       party in this case who is registered as an electronic case filing user with the Clerk;

14  Robert A. Rabbat, Esq.
    ENENSTEIN PHAM & GLASS LLP

15  11920 Southern Highlands Pkwy., Ste. 103
    Las Vegas, NV 89141

16  *Attorneys for Plaintiff*

17

18                           BY */s/Annemarie Gourley*_____
                                An Employee of

19                                WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

20

21

22

23

24

25

26

27

28

285923833v.1